Case number 18-7181, Stephanie Waggel, Appellant v. George Washington University. Mr. Tapa for the Appellant, Mr. McConnell for the Appellant. Good morning, Your Honors. Dr. Waggel asked you to uphold important principles today. First, that our laws place responsibility on employers to work proactively with employees who suffer a serious medical condition to offer reasonable accommodation. Second, Dr. Waggel requests that you confirm that it is improper for district courts to weigh evidence, make credibility determinations, and render inferences against the non-movement on summary judgment. Finally, Dr. Waggel asks that you reverse summary judgment because the district court failed to address the expert report of Dr. Spitz, a well-credentialed residency training director from the University of Chicago, relevant to reasonable accommodation as well as disability discrimination issues. Counsel, I know you have the argument about the expert testimony you wanted to introduce, but what is it that you think, under the statute or if you're going beyond the statute, triggers the interactive obligation? Well, I think here that the interactive obligation is triggered by a number of factors. It's not simply a situation where you have to go to the EEO office to trigger it, in our view. In our view, there was more here than that, quite a bit more here than that. I understand your argument. What authority are you relying on? Well, I think just in general, the idea that there's a whole line of cases which state that you don't need any magic words in order to trigger this process. So Dr. Waggel went to the EEO office on campus and asked what she needed to do to protect her ability to take medical leave. That apparently did not trigger anything on their part, but there was more than that. I thought you conceded or acknowledged that that office told her to exercise her rights under the family medical leave. That's correct, Your Honor. They did not do more than that, though. So why wasn't that sufficient? Well, in this case, unfortunately, it was not sufficient, because even though she took FMLA leave, it was not sufficient in the sense that, first of all, she had to work during the leave on some occasions. That's certainly in the record. She had to what? I'm sorry? You said something and I couldn't hear it. Yeah, she had to work during the leave. So she worked during her FMLA leave. She felt she had to do it because when she asked for accommodations in the sense of meeting with her doctors, she wasn't allowed to go on a lot of occasions. That's in the record as well. So that's why she decided she needed FMLA leave. In fact, she asked her doctor to fill out the forms for it. So there's a lot in the record. So it's not just going to the EEO office, getting the FMLA leave, but in addition, there's the issue that she asked her supervisors for the ability to not only take time off for her surgery, also time off for late duty after a return from surgery, but also set time in advance for medical appointments. So her supervisors realized this. No magic words again. On top of that, she had difficulties coming back from her late duty. And as our expert noted, that should have also put the GW. I understand your argument, but I want to understand from the programmatic point of view of the school. She's in a program that, so far as I know, is very intense in terms of demand on time, energy, your brain, your sense of common sense. So your client is obviously concerned about her cancer. So EEO says take family and medical leave. That doesn't work, you say. It didn't, yes. Then what obligation does your client have? Any? Well, I think she did what she could do because she tried to work with the program to make it work in terms of having her be able to do her medical appointments and still do her job. So was it the obligation of her supervisor to step in at that point? Yes, I think that's if you look at Dr. Spitz's expert report. I mean, that's what she says. So Dr. Spitz was the training director at University of Chicago, and she actually trains other residency directors. No, I understand. I understand. I just don't want to get to that evidentiary point for the moment. Looking at the statute, the regulations, what case law there is, how does this record show that GW failed to meet its obligation to engage in this interactive process? According to the record viewed most favorably to you, at least in the initial stage, there was a response by the program in terms of the family and medical leave. Now, when that didn't work, what's the next step? I mean, who's responsible at that point? Well, I think at that point, in our view, it was the university's responsibility to reach out to her and interact with the process and determine if she needed more. So the key issue, and we agree with the expert on this, is that she had this right when she came back from her light duty. She had her surgery. She had two weeks light duty, which the record suggests wasn't all that light because she worked some extra, basically day-to-night shifts during that period. GW will say it was sort of unintentional, the one issue where it came up. But then she had a very disastrous night shift on August 25th where she just sort of broke down. She just couldn't cope with the demands at the time, which were that basically a homeless shelter had closed and they were inundated with different people with mental problems. She just couldn't handle it. So at what point did this idea of transfer enter into the picture? That came in later when one of the doctors who was an ombudsman at the school suggested to her that it looks like she's not going to make it there. It may be a good idea for her to try to transfer. So she tried to work that out with Dean Berger, who was sort of the administrative dean. So did she go to the ombudsman? She did, yes. And Dean Berger was working with her, but the record also suggests that his efforts to have her transfer were shot down for two reasons. First of all, Dr. Catapano and Dr. Griffith, who ran the program, would not basically give her the credit she needed in order to go to another program. And they wouldn't really interact with the other programs. So from their point of view, she wasn't qualified for a transfer? I believe that's what they said in their testimony. But that's sort of contradicted by Dr. Berger, who obviously thought otherwise. I see I wanted to reserve two minutes for my rebuttal before it has any other questions. When you said there's a long line of cases about no magic words, what are those cases? They're cited in our brief, but it's – I think the Ward case talks about it. A lot of the ones that – I believe the Ward case. There's certainly district court cases that talk about it. I'll get you the page in our brief here. Is there any court of appeals case other than Chenery? There may be, but I'm not aware of it. When you say there may be, what does that mean? Well, I know this is an issue that is always sort of discussed in the EEO world. You researched this question. We – generally, I mean, it was not – we never thought this was necessarily the focus of this case, but it is one of the – So you don't think this is an important issue on appeal? No, well, I think it's part of it, part of the issue. Okay, and did you find any case on this? Other than the ones we cited, no. Thank you. We'll hear from the other side. Reserve the time. May it please the Court, if I may, I would like to begin with reference to some matters that rose on appeal for the first time in the reply brief, to which we, therefore, have not had an opportunity to respond. If I may just briefly, at pages eight and nine of the reply brief, plaintiff asserts that GW, without Dr. Wagle's consent, communicated with two of her attending physicians, Dr. Jarrett, her surgeon, and Dr. Siegel, her oncologist, and that that violated her medical privacy rights. ECF docket entry number 15 in the court below is – Your argument is this was only raised in the reply brief for the first time? Yes. And you don't need to discuss it because it's forfeited. What else? Very well. Unless there are exceptional circumstances that would explain why it was not raised until the reply brief. I don't know why it would not have been raised, Your Honor. It's a matter of concern from a professional point of view, but it sits there in the record. I wonder if you would address the question I was asking counsel about. At what point does GW have a responsibility to engage in an interactive process? Your Honor, I believe that occurs at the point where a person, particularly in the position of this trainee, is advised to go to an office that has been designated by the university with thousands of employees. This is where you go to get this kind of help and assistance. The first moment that the program director became aware that Dr. Wagle was having health-related difficulties in her training program in May of 2015 led Dr. Katapano, the program director, immediately to suggest that she consider taking medical leave to address those problems right away. So under the university's regulatory scheme, that was the avenue for relief. Yes. This is a question. When that relief proved insufficient, then under the regulatory scheme, she should have returned to the EEO office? If I may, Your Honor, different point. Dr. Wagle at the time was not eligible for FMLA leave because she didn't have sufficient time and service. She was sent to the Benefits Department to look at what they could do for her, what could be done here for Dr. Wagle. And Ms. Van Leeuwen... You said she wasn't eligible. She was not yet time eligible for FMLA leave. So that suggestion of the EEO office was meaningless? No, no. Quite the opposite, Your Honor, if I may. Because she was not eligible under the standard benefits program yet for FMLA leave, she received an email from Ms. Van Leeuwen in the benefits office saying, you can't get these benefits yet under FMLA leave. But you get the same benefits, you can get the same benefits under the Americans with Disability Act, the ADA Act. And in an email to her said, you can get these benefits. They are available through the OEEO, the GW, Office of Equal Employment Opportunity. Please go there. She said, in fact, it is recommended that you do this. She gave the email address, the physical address, and the telephone contact number in the email. Please do this, Dr. Wagle, because this is where we will be able to help you. Dr. Wagle never went there, and certainly not at that time. She didn't go to the office. Instead, she took just ordinary leave. She didn't seek to invoke either of these statutes. The first time she applied for FMLA leave wasn't until well after her surgery. Her surgery was in July. She came back to work in August. The first time she applied. So she was eligible then? Yes, because she at that point had one year of service. You become eligible for FMLA leave once you've been in active service one year. Her training program had begun the year before on July 1. So she became FMLA eligible on July 1 of 2000. It would have been 15. So the university's position is it has set up a regime that offers an avenue for accommodation. Yes, Your Honor. And failing to do that, the university has no obligation. Well, you know, the point is when an employee, the trainees are in the status of an employee, is asked to go directly to this office, these are the people who know how to do this and can apply this uniformly across this university. So everybody gets treated fairly. The position Dr. Wagle takes here is that somehow people across the university, faculty members, program administrators, should all be equally responsible for seeing that she gets appropriate accommodation under the ADA. Well, it is a particular statute with particular procedures, particular needs and demands and requirements. The university has set up an office so that everybody who has that kind of a need can go there and be properly handled and receive appropriate benefits. What about the principle in our Chinari case relating to the fact that, you know, employees must use the formal processes unless it's so apparent that an accommodation needs to be sought? I mean, here she had interaction with a number of different people at the university. Why wasn't it not so apparent that accommodation was necessary? Well, it wasn't so. It's very interesting because in the record, at all times when it was recommended to Dr. Wagle by the program director and others that she take leave, Your Honor, her pushback was, no, I don't need that. I'm doing just fine. I am fine. That was always her response. The program was saying to her, you may need to be taking care of yourself. Please go here and do this. And she would push back, no, everything is fine. I don't need that. The university does set that system up for the very reason that if someone needs that kind of help, there it is. Please go and take advantage of it. Dr. Wagle didn't do that. She didn't apply for FMLA leave until October, which, as soon as she applied, was immediately granted. She applied for FMLA leave on two occasions, and she admits on each of those two occasions it was immediately granted. The first time in October when there was a dispute over whether she would get more than standard time off to take a national USMLE medical licensing exam, and the second time was much, much later in February after a decision had already been made for her dismissal. She applied again for FMLA leave, this time for the first time for intermittent leave, which she invokes throughout her brief as necessary to schedule appointments in advance. As soon as she applied for the intermittent FMLA leave in February, it was immediately granted. So on every occasion where she engaged the appropriate system, she got the relief requested. She never went to the OEEO and in any meaningful way had a discussion, if she had a discussion at all, never had a discussion that could fairly be read as having in any way suggested to the OEEO that she was there for the purpose of seeking ADA benefits. So following up on Judge Rouse's question, if I may, let's assume that she had this pushback, and from my understanding of the record, and I'm sure yours is more complete than mine, she didn't want to lose time and therefore have to repeat certain courses. So let's assume that that is the situation. If she says, I'm fine, I'm fine, but it's perfectly obvious to everyone that she is not fine, because she's just not performing as a resident would be expected to perform in this program. And there seems to be, and the university is aware, she does have this very serious cancer problem. So at that point, I mean, suppose an employee is just falling down on the job. There's no obligation on the university just to step in and say, we're forcing you, as it were, to take administrative leave? Two different points, Your Honor. It wasn't clear to everybody that, in fact, Dr. Wagle's problems, as a matter of fact, it did not appear that any of Dr. Wagle's problems that were causing her difficulty in the program were health-related. No, no, that continued even after. She had her cancer diagnosis in June. She had an in-and-out two-day surgical procedure in July. She had a two-week recovery period. That surgery was deemed curative. I mean, she was among the very lucky young people with a cancer diagnosis, deemed to be curative. The follow-up was a once-a-year meeting with a physician for imaging studies to evaluate them to see that the cancer, in fact, had been cured. And that's what she told, at least at the initial stages, that's what she told the faculty members that she engaged with. So her problems that she was having in the program were not disease-related or apparently disease-related. She flunked two basic courses and refused to acknowledge that she would need to repeat them, one of them a psychoanalytical course that she had to pass in order to keep moving forward in the program. She was dishonest at various times with faculty members. That is not a health-related issue. I mean, there were multiple instances where she simply did not deal honestly with professional colleagues. There were instances where she simply no-showed for important clinical duties without any excuse. And when excuses were offered, they were clearly invalid excuses. I mean, there were multiple, multiple problems in her tenure in the program totally unrelated to any apparent health-related issue, Your Honor. And that's what became the focus of the decision, ultimately, by the Clinical Competency Committee, that she needed to be dismissed from the program. The record appears to show that the district court very, very carefully parsed the complicated records. Just hold and see if anybody else has further questions. Judge Rogers. Judge Rogers. Okay, thank you. Thank you very much, Your Honor. Is there time left? Okay, we'll give you two minutes. Hard to say anything in 26 seconds. Thank you. Your Honor, first of all, Judge Garland, you asked about the No Magic Words case. The case we cited, page 22 of our brief, it's Floyd v. Leeds, a district court case, but it quotes a circuit court case from the Third Circuit. I'm trying to find any case close to this. The only example that we gave in our own opinion is one where there was a disabled person in a prison, obviously in need of assistance, who wasn't getting it. What's the closest case? Yeah, I think when we looked at the cases here, we didn't find anything exactly like this. So in many ways, this is a, to a certain extent, first impression. There are certain cases in other jurisdictions on this. In terms of... And did you cite those in your brief? Yes, it's page 22 and 23 of our brief. In terms of the issues we've been talking today, I mean, you heard Mr. McConnell's view of the case, but this case is full of questions of material fact that we believe were in dispute. There was a huge record in this case, and one of our concerns that we had was that Judge Gattelli really picked and chose what she thought was important and left aside many other things. For example, she focused in on this decision that the Clinical Competency Committee, sort of, it's a document that was used to justify firing Dr. Wagle. So this is a document, first of all, Dr. Wagle never saw pre-litigation. It was just produced in the litigation. Secondly, it was heavily redacted at the end. Thirdly, according to Dr. Dyer, who was the head of the CCC, when he went through the records of Dr. Wagle, he did not look at the whole person as he should have, but instead picked and chose just negative information about her. There was a whole host of positive information, including reviews from the doctors who she actually worked with. Also, this question of academic due process, they admitted that the appeals were really fraudulent because Dr. Berger, who would be the ultimate deciding authority on the appeals, told Dr. Dyer that he would just affirm whatever they did. So, no, she did not get academic due process. Yes, there are many questions of material fact and dispute. This should be decided by a jury, not by the district court on summary judgment. And again, I would point to Dr. Spitz's expert report, which goes through Dr. Wagle's training experience in great detail. And now you're over on the over. Let me just ask if any of the judges have any questions, in which case we'll continue. Do you have more questions? No. No? Okay, fine. Thank you. We'll take the matter under submission. Thank you very much to both sides.
judges: Garland, Rogers, Rao